# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA

**ESTATE OF VICTOR LAMBOU**
**DENITA LAMBOU,** Co-Personal Representative, Heir, Potential Beneficiary
**GERALYN LAMBOU,** Co-Personal Representative, Heir, Beneficiary
**VICKI LAMBOU,** Heir, Potential Beneficiary
*Plaintiff(s)*
-vs-
**STATE OF FLORIDA, ET AL.,**
LEONARD HELFAND,*Professionally & Individually,* ANNE VAN METER, *Professionally & Individually,* HOWARD KESSLER, *,Professionally & Individually,* TWYLA SKETCHLEY,*Professionally & Individually,* WILLIAM JOHNSON, *Professionally & Individually,* VICTORIA HEULER,*Professionally & Individually,* THE SKETCHLEY LAW FIRM ,WILLIAM JOHNSON, P.A.,HEULER, WAKEMAN, SOLOMON LAW GROUP, PLLC, TAPESTRY SENIOR LIVING, ASSISTED LIVING & MEMORY CARE, TAPESTRY COMPANIES, CHERRY LAUREL, HOLIDAY BY ATRIA, INC., ATRIA MANAGEMENT COMPANY, LLC, LEON COUNTY CLERK OF COURT, FLORIDA DEPARTMENT OF HEALTH, THE FLORIDA BAR ASSOCIATION, STATE OF FLORIDA, DR. PAUL KATZ*, Professionally & Individually, Defendant(s).*

**SUPPLEMENTAL COMPLAINT**
**Trial By Jury Demanded**
Case No. 1:24-cv-228

 **Action for Violations of the Organized Crime Control Act of 1970. Pub.L.No. 91-452, Title IX, "Racketeer Influenced and Corrupt Organizations Act" ("RICO") (codified at 18 U.S.C. §§ 1961-1968) 42 U.S.C. § 1320a-7b(b),42 U.S.C. 1395,18 U.S.C. §666,18 U.S.C. §641,18.U.S.C. §1341, 1343,18.U.S.C. §371 and Common Law Claims**

This case is related to a False Claims Qui Tam Case under Seal Case No. 6:23-CV-00189-WWB-LHP. Plaintiffs, complaining of the Defendants, and seeking legal and equitable relief as prayed for herein, would show unto this Honorable Court:

## I.   <u>SUMMARY OF ACTION</u>
### The Guardianship/Sham Probate Enterprise

1.     This is an action brought pursuant to 18 USC Section 1962 *et seq.* (hereafter referred to as **"RICO")** to recover legal damages, attorney's fees and costs and equitable remedies, as well as such other and further relief as the Court deems appropriate, for the cumulative actions of the Defendants (hereafter collectively referred to as the **"Collaborators" or as "Defendant"),** of which Plaintiffs (as defined below) have been the victims of a widespread, comprehensive, systematic, continuous, ongoing scheme to deceive and defraud them and others, as well as deprive Plaintiffs of their property through a long list of racketeering activities prohibited by **RICO.** The liability of the **Collaborators** and each of them is reflected in court filings, property transactions, witness interviews, bank records, trust documents, medical records, other professional records, depositions and hearing transcripts which demonstrate a clear pattern of ongoing racketeering activity by an association-

in-fact enterprise involving various predicate acts executed by the **Collaborators** and others to deprive Plaintiffs (as defined below) of valuable property and rights.

2.    This association-in- fact will be referred to throughout as the **Guardianship/Sham Probate Enterprise .** These comprehensive, multiple and inter-related schemes to deceive and defraud are generally characterized by lawyers knowingly self-dealing while committing fraud in the creation or administration of guardianship and probated estates, settlements, trust agreements and property transactions, some of which were purportedly authorized by court orders for which the judicial officers involved do not enjoy any form of immunity, particularly when those judicial officers have knowledge of the ongoing pattern and scheme and take no steps to protect the victims, even assisting in the abuse of the victims, while the **Collaborators** failed to disclose conflicts of interest and committed extortion under Florida law, as well as other predicate acts. In this regard, various financial institutions, some of whom are named **Collaborators** herein, have willingly participated in the schemes along with health care workers and health care institutions who fraudulently created assessments and other fraudulent documentation to further their trodding of the rights of

the victims including the Plaintiffs here. The use of the court system to advance the racketeering scheme is particularly egregious as it victimized the entire judicial system, impacts the administration of justice across the board and undermines the integrity of the state court legal and judicial process for everyone.

3.    Each of the **RICO Collaborators** and other parties was associated with or participated in the affairs of the **Sham Guardianship/Probate Enterprise** as defined above, in that they conducted or participated directly or indirectly in the operation of the **Sham Guardianship/Probate Enterprise** through a "pattern of racketeering activity" within 18 U.S.C. §1961(1) and (5) and §1962(c), *to wit:* multiple, repeated, and continuous violation of 18 U.S.C. §1341 (mail fraud), 18 U.S.C. §1343 (wire fraud) and S.C. Code §16-17-640 (extortion). The pattern of racketeering conduct includes multiple mailings, wire transmissions and acts causing the Plaintiffs to give up property and assets. The **Collaborators** and related parties all conducted themselves in a manner knowing their activities, joint activities, and actions were directed toward the Plaintiffs and the Ward's heirs and estate in concert acting on behalf of the **Sham Guardianship/Probate Enterprise** which would and

did and continues to cause Plaintiffs and their heirs and estate significant harm.

## II.  **JURISDICTION**

4. This Court has jurisdiction under 18 U.S.C. § 1964(a) and (c) (RICO); 28 U.S.C. § 1331 (federal question).  Supplemental jurisdiction under 28 U.S.C. § 1367 exists as to those claims that are so related to the federal claims in that they form part of the same case or controversy.  The matters in controversy arise under the Constitution, treaties and laws of the United States, including those regulating commerce.

5. Venue is proper in this Court under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district. The ends of justice are served because joint trials for claims against related parties conserve resources and avoid inconsistent verdicts.

## III.  **PARTIES**

1. Victor William Lambou ("Decedent") was a long-term resident of Wakulla County who, at the time of his death on August 20, 2022, was domiciled in Leon County, Florida. Prior to his death, members of the Florida Bar, who are Defendant Collaborators, advised

Decedent that filing for a Voluntary Guardianship would ensure proper management of his estate.

2. Plaintiff Denita Lambou is domiciled in the Northern District of Florida. She brings this action both individually and in her capacity as Personal Representative of the Estate of Victor William Lambou. The Defendant Collaborators, through their coordinated actions, prevented Plaintiff Denita Lambou from performing her duties as Personal Representative. The Defendant Collaborators seized control of, diverted, and personally retained a substantial portion of the assets that were in Victor William Lambou's possession and/or trust, and following his death, in his estate, of which Denita Lambou serves as Personal Representative.

3. Plaintiff Geralyn Lambou is domiciled in St. Tammany Parish, Louisiana. She brings this action both individually and in her capacity as Personal Representative of the Estate of Victor William Lambou. The Defendant Collaborators, through their coordinated actions, prevented Plaintiff Geralyn Lambou from executing her duties as Decedent's Power of Attorney, Trustee, and Health Care Power of Attorney. The Defendant Collaborators seized control of, diverted, and personally retained a substantial portion of the assets that were in Victor William Lambou's possession and/or trust, and

following his death, in his estate, of which Geralyn Lambou serves as Personal Representative.

4. Plaintiff Vicki Lambou is domiciled in Clark County, Nevada. She brings this action both individually and as a potential beneficiary and natural heir of the Estate of Victor William Lambou. The Defendant Collaborators, through their coordinated actions, prevented Plaintiff Vicki Lambou from participating in her father's care and excluded her from information regarding changes to estate planning. The Defendant Collaborators seized control of, diverted, and personally retained a substantial portion of the assets that were in Victor William Lambou's possession and/or trust, and following his death, in his estate, of which Vicki Lambou is a natural heir and potential beneficiary.

5. The Defendant Collaborators formed and operated a coordinated association-in-fact enterprise ("Sham Guardianship/Probate Enterprise") that employed fraudulent practices and abuse of the legal system to exploit vulnerable individuals ("victims"). This enterprise diverted victims' assets and income to generate unwarranted professional fees payable to the Collaborators and others. The enterprise operated in conjunction with certain relatives of victims, some of whom are named as Collaborators herein, who pursued their

own financial interests to the detriment of the victims. These actions systematically impaired victims' rights to self-determination, liberty, and freedom, while destroying their ability to control and direct the use of their assets.

6. The Sham Guardianship/Probate Enterprise manipulated the Leon County Guardianship/Probate Court ("the Guardianship/Probate court") to facilitate the Collaborators' misappropriation of victims' assets and income. These actions undermined the stated will of the victims, damaged the integrity of the Probate Court, and enriched the Collaborators, all of whom operated for profit and benefited financially from their actions and omissions as detailed herein, to the detriment of the victims. This case represents the second of several similar matters to be filed on behalf of other victims.

7. Upon information and belief, multiple victims have been harmed by these Collaborators, and the Sham Guardianship/Probate Enterprise continues to operate at present. The Probate court continues to enable the Enterprise's operations, with several named Defendant Collaborators maintaining their positions of responsibility over current victims, who face similar risks of exploitation as these Plaintiffs have experienced.

8. Defendant Leonard Helfand ("DEFENDANT HELFAND"), a member of The Florida Bar, served as the former guardian of the Testator. DEFENDANT HELFAND is domiciled in the Northern District of Florida.

9. Defendant Anne Van Meter ("DEFENDANT VAN METER") served as the former successor guardian and Successor Trustee of Victor Lambou Estate and Trust and took actions to fraudulently induce the Ward to modify his Estate Planning. DEFENDANT VAN METER is domiciled in the Northern District of Florida.

5. Defendant Howard Kessler ("DEFENDANT KESSLER"), the spouse of VAN METER, fraudulently bound the Ward into contracts based on unexecuted healthcare surrogate forms, provided healthcare services to the Ward, and wrongfully appropriated substantial funds from the Ward's Estate. DEFENDANT KESSLER executed contracts for reimbursement with the deceased ward while the Ward lacked capacity. DEFENDANT KESSLER is domiciled in the Northern District of Florida.

6. Defendant Twyla Sketchley, Esq. ("DEFENDANT SKETCHLEY"), a member of The Florida Bar, served as attorney for the Ward. DEFENDANT SKETCHLEY misrepresented to the Ward that filing a

Petition for Voluntary Guardianship would result in his Estate being managed by financial experts. DEFENDANT SKETCHLEY owns "The Sketchley Law Firm" and is domiciled in the Northern District of Florida.

7. Defendant William Johnson, Esq. ("DEFENDANT JOHNSON"), a member of The Florida Bar, served as attorney for both the Guardian and Successor Guardian, as well as for DEFENDANT KESSLER. DEFENDANT JOHNSON owns "William Johnson, P.A." law firm and is domiciled in the Northern District of Florida.

8. Defendant Victoria Heuler, Esq. ("DEFENDANT HEULER"), a member of The Florida Bar and President of the Elder Law Committee, served as attorney for the Guardians of Property and DEFENDANT KESSLER. DEFENDANT HEULER owns "Heuler, Wakeman, Solomon Law Group, PLLC" and is domiciled in the Northern District of Florida.

9. Defendant Tapestry Senior Living, Assisted Living & Memory Care ("DEFENDANT TAPESTRY") housed the Ward based on fraudulent unexecuted documents and statements provided by members of the Bar, guardian, and Trustee. DEFENDANT TAPESTRY is domiciled in Leon County, Florida.

10.    Defendant Tapestry Companies ("DEFENDANT TAP CO") housed the Ward based on fraudulent unexecuted documents and

statements provided by members of the Bar, guardian, and Trustee. DEFENDANT TAP CO is domiciled in Hennepin County, Minnesota.

11.     Defendant Cherry Laurel ("DEFENDANT CHERRY") housed the Ward based on fraudulent unexecuted documents and statements provided by members of the Bar, guardian, and Trustee. DEFENDANT CHERRY is domiciled in the Northern District of Florida.

12.     Defendant Holiday by Atria, Inc. ("DEFENDANT HOLIDAY") is domiciled in Orange County, Florida. Defendant Atria Management Company, LLC ("DEFENDANT ATRIA") housed the Ward based on fraudulent unexecuted documents and statements provided by members of the Bar, guardian, and Trustee. DEFENDANT ATRIA is domiciled in Jefferson County, Kentucky.

13. Defendant Leon County Clerk of Court (DEFENDANT CLERK) is a government entity with its principal place of business at 301 S Monroe Street, Suite 100, Tallahassee, Florida 32301.

14. Defendant Florida Department of Health (DEFENDANT HEALTH) is a state agency with its principal place of business at 4052 Bald Cypress Way, Tallahassee, Florida 32399-1700.

15. Defendant The Florida Bar Association (DEFENDANT TFB) is a professional organization and regulatory body for attorneys in

Florida with its principal place of business at 651 East Jefferson Street, Tallahassee, Florida 32399-2300.

16.  Defendant State of Florida DEFENDANT STATE) is a sovereign state with its capital and seat of government at 500 South Bronough Street, Tallahassee, Florida 32399-0250.

17.  Defendant Dr. Katz (DEFENDANT KATZ) is an individual whose principal place of business is located at 1115 West Call Street, Tallahassee, Florida.

## IV.   <u>STATEMENT OF THE CASE</u>

6.     Each and every allegation set forth above is realleged and reasserted as if set forth verbatim herein.

The Defendant **Collaborators** created **Guardianship Sham Probate Enterprise as** an association-in- fact enterprise which operated though a pattern of racketeering conduct in order to deceive and defraud the Plaintiffs and others similarly situated.

This action arises from a systematic scheme of elder exploitation and financial mismanagement of Federal OPM Retirement Funds perpetrated against Victor W. Lambou (the "Testator"), a 90-year-old man diagnosed with dementia. Following the Testator's documented cognitive decline in 2017-2018, the defendants orchestrated a series of coordinated actions to gain control over his person and property, estimated at approximately $500,000.00, through questionable guardianship proceedings and trust modifications, resulting in the complete depletion of the Estate for the financial gain of the Defendant(s), including additional funds gained through kick-backs and referrals.

The defendants - Twyla Sketchley, Esq., Howard Kessler, M.D., Anne Van Meter, and Leonard Helfand - exploited their professional positions and fiduciary duties to:

1. Obtain control over the Testator's assets taking action to conceal he was mentally incapacitated.

2. Circumvent proper legal procedures for guardianship administration

3. Make unauthorized disbursements exceeding $71,223.79 without court approval

4. Conceal financial transactions and records from the Court and beneficiaries

5. Improperly modify estate planning documents executed while the Testator lacked capacity

Through their coordinated efforts, the defendants displaced the Testator's designated power of attorney, healthcare surrogate, and successor trustee - his daughter Geralyn - and proceeded to deplete his assets through suspicious transactions, unauthorized fees, and improper property dispositions. This conduct violated multiple Federal and Florida statutes governing guardianships, trusts, and elder exploitation, causing substantial damages to the Testator's estate and intended beneficiaries.

## V.    SUMMARY OF SHAM GUARDIANSHIP/PROBATE ENTERPRISE
### Scheme to Deceive and Defraud

7.    The purpose was to engage in a "pattern of racketeering activity" under 18 U.S.C. §1961(5) by repeated violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). The purpose was to continue the scheme to defraud through extortion (under Florida laws) by witness tampering under 18 U.S.C. § 1512 (b)(l) by using threats and sham lawsuits in order to intimidate Plaintiffs and Plaintiffs' counsel into giving up their representation of Plaintiffs, thereby further robbing them of the right to the peaceful enjoyment of their property.

8.    <u>Membership of the Scheme to Defraud Management</u>: All phases of the scheme and membership in all phases of the Scheme to Defraud include all Defendants:

9.    <u>Victims of the Guardianship/Guardianship/Sham Probate Enterprise</u> are the Plaintiffs, the Estate of Victor Lambou, by and through its Personal Representatives Denita Lambou and Geralyn Lambou individually, and the state court judicial system.

10.    <u>Timeframe of the Scheme to Defraud</u>: The timeframe was from at least 2017, but the Trust documents were first executed in 1995. The "pattern of "racketeering activity" was through its persistence, similarity, duration of the regular way of doing business with respect to the Plaintiffs and others that, by information and belief,

they have victimized. The **Guardianship/Sham Probate Enterprise continues** through the present by way of Defendant **Collaborators'** recent extortion attempts in filing lawsuits against Plaintiffs, prospective Plaintiffs and Plaintiffs' counsel in an effort to separate Plaintiffs' counsel from their clients by intimidating Plaintiffs' counsel, thereby demonstrating both closed and open continuity.

## **FACTUAL ALLEGATIONS**

A. **TESTATOR'S DEMENTIA DIAGNOSIS & ESTATE PLANNING**

1. On October 2, 2017, PLAINTIFF DENITA witnessed PLAINTIFF VICKI obtaining a Baker Act Order from Judge James Shelfer for the Testator's medical evaluation. This followed multiple well-care law enforcement interventions due to the Testator exhibiting: angry outbursts, confusion, memory loss, and irrational aggression toward his frail wife, rendering him a danger to himself and others.

2. On April 5, 2018, the Testator and PLAINTIFF GERALYN retained DEFENDANT TWYLA SKETCHLEY, ESQ. and The Sketchley Law Firm, P.A. for Estate Planning services. DEFENDANT SKETCHLEY prepared the Testator's Revocable Trust, designating PLAINTIFF GERALYN as Successor Trustee. DEFENDANT SKETCHLEY also prepared the Testator's Will, naming PLAINTIFF GERALYN as the Testator's DPOA and Healthcare Surrogate. PLAINTIFF GERALYN was additionally named as a Trust beneficiary.

3. On June 1, 2019, the Testator and PLAINTIFF GERALYN mutually agreed that GERALYN would resign from her employment and relocate from Louisiana to provide full-time care for the Testator at his residence. This agreement was formally documented with yearly renewable terms, including reimbursement for out-of-pocket expenses and an agreed-upon monthly operating cost of approximately $800.

4. On July 25, 2019, due to the Testator's severe cognitive decline, PLAINTIFF GERALYN contacted DEFENDANT HOWARD KESSLER and his wife, DEFENDANT ANNE VAN METER, upon a friend's recommendation, seeking guidance regarding dementia evaluation for the Testator. DEFENDANT KESSLER, M.D., serves as a licensed Florida medical doctor with a leading role on a capacity evaluations examination committee. DEFENDANT VAN METER possessed over nine years of elderly care experience through Lutheran Ministries.

5. Between July 25 and October 1, 2019, DEFENDANTS KESSLER and VAN METER provided regular guidance to PLAINTIFF GERALYN via in-person meetings, phone calls, and text messages regarding the Testator's symptoms of forgetfulness, paranoia, anger outbursts, and obsession with his housekeeper. DEFENDANT VAN METER

cautioned PLAINTIFF GERALYN against leaving the housekeeper alone with the Testator due to exploitation risks. Both DEFENDANTS advised PLAINTIFF GERALYN to employ deceptive tactics to manage the Testator's behavior and requested transfer of his financial records and finances to their control.

6. On August 15, 2019, Dr. Paul Katz, M.D., diagnosed the Testator with Dementia following a MoCA test administration. The Testator was subsequently prescribed Donepezil, a medication commonly used to treat Alzheimer's disease symptoms including memory loss and confusion. DEFENDANTS KESSLER and VAN METER were duly informed of this diagnosis.

7. Between August 27-31, 2019, DEFENDANTS KESSLER and VAN METER visited the Testator's residence at 272 Pine Lane, Crawfordville, FL 32327. During this visit, DEFENDANT VAN METER deliberately removed PLAINTIFF GERALYN from the premises to enable DEFENDANT KESSLER to privately meet with the Testator. It was subsequently discovered that DEFENDANT KESSLER had induced the Testator, previously diagnosed with Dementia, to sign undisclosed documents without proper review or witnesses present.

8. On September 9, 2019, DEFENDANTS KESSLER and VAN METER executed a written statement on DEFENDANT KESSLER's medical letterhead, attesting to witnessing the Testator grant estate administration authority to his grandson.

9. Between September 17-30, 2019, DEFENDANTS SKETCHLEY, KESSLER, and VAN METER informed PLAINTIFF GERALYN of their unilateral decision to relocate the Testator to an undisclosed memory care facility without consulting PLAINTIFF GERALYN (his DPOA) or other immediate family members. This action caused significant distress to the Testator's family regarding his whereabouts and well-being. The DEFENDANTS did not disclose their intention to revoke PLAINTIFF GERALYN's DPOA authority. Despite PLAINTIFF GERALYN's expressed opposition to removing the Testator from his home, DEFENDANT SKETCHLEY assured that the Testator would remain in Florida and PLAINTIFF GERALYN could continue residing in her father's home.

## B. GUARDIANSHIP ESTABLISHMENT AND PROCEEDINGS

10.    On October 11, 2019, DEFENDANT SKETCHLEY filed a Petition for Voluntary Guardianship on behalf of Victor William

Lambou, a 90-year-old widowed male diagnosed with Dementia. The petition sought to appoint DEFENDANT HELFAND as guardian of property, listing assets valued at approximately $500,000.00.

11.    One year prior to this petition, the Testator had retained DEFENDANT SKETCHLEY for estate planning, during which he designated PLAINTIFF GERALYN as:

      A. Power of attorney
      B. Healthcare surrogate
      C. Personal representative
      D. Successor trustee

12.    On October 11, 2019, DEFENDANT SKETCHLEY filed a Petition for Voluntary Guardianship on behalf of Victor William Lambou, a 90-year-old widowed male diagnosed with Dementia. The petition sought to appoint DEFENDANT HELFAND as guardian of property, listing assets valued at approximately $500,000.00.

13.    One year prior to this petition, the Testator had retained DEFENDANT SKETCHLEY for estate planning, during which he designated PLAINTIFF GERALYN as:

      A. Power of attorney

B. Healthcare surrogate
C. Personal representative
D. Successor trustee

## C. FACTUAL ALLEGATIONS REGARDING GUARDIANSHIP PROCEEDINGS

14.   On October 11, 2019, DEFENDANT SKETCHLEY filed an unsigned Petition for Voluntary Guardianship of Property on behalf of the Testator, naming DEFENDANT LEONARD HELFAND as guardian of property. The petition alleged:

A. The Testator was estranged from his children
B. Family members had exploited the Testator
C. The Estate was valued at approximately $500,000 DEFENDANT SKETCHLEY filed to revoke PLAINTIFF GERALYN'S DPOA & Healthcare Surrogate in Leon County, rather than Wakulla County where estate documents were originally filed. DEFENDANT SKETCHLEY failed to properly notify PLAINTIFFS DENITA, VICKI, and most critically, PLAINTIFF GERALYN (then-current DPOA holder) via formal notice with signed receipt as procedurally required.

15.    On October 11, 2019, the Testator was isolated at a location known only to DEFENDANT SKETCHLEY and her business associates. During this period:

A. The Testator's Trust was amended to replace GERALYN as Successor Trustee with DEFENDANT ANNE VAN METER

B. DEFENDANT HOWARD KESSLER assisted in preparing a binding payment agreement between himself and the Testator

C. DEFENDANTS HOWARD KESSLER and VAN METER redirected the Testator's mail to their home address

16.     On October 12, 2019, DEFENDANT HOWARD KESSLER, M.D., executed a contract with Cherry Laurel on behalf of the Testator (effective date 10-11-2019), wherein he:

A. Listed himself as the only family contact
B. Omitted PLAINTIFFS DENITA, VICKI, and GERALYN
C. Received an undisclosed $750 referral fee from Cherry Laurel

17.     On November 19, 2019, the Court granted the Petition for Voluntary Property Guardianship, appointing DEFENDANT LEONARD HELFAND as guardian of property over all the Testator's assets and property, including the living revocable trust.

18.     On December 4, 2019, DEFENDANTS HOWARD KESSLER, M.D. and VAN METER initiated actions to sell the Testator's paid-off homestead, disregarding his pre-Dementia expressed wishes to

remain in his home with his dog, Fauna, and his horticulture projects until death.

## D. FACTUAL ALLEGATIONS REGARDING GUARDIANSHIP PROPERTY AND ACTIONS

17. On November 19, 2019, DEFENDANT SKETCHLEY filed an Amended Petition for Voluntary Guardianship. In Paragraph 6, the Ward explicitly stated that his property, valued at approximately $500,000.00, included property in his revocable living trust, of which he was trustee. He indicated his intention to appoint a new trustee with professional experience to work with the guardian in managing his financial affairs.

18. The Court granted this Petition and issued Letters on November 19, 2019. The Order contained no restrictions specifying that only certain property was under Guardianship. Per Florida Statute §744.341(2), regarding Voluntary Guardianships:

"If requested in the petition for appointment of a guardian brought under this section, the court may direct the guardian to take possession of less than all of the ward's property and of the rents, income, issues, and profits from it. In such case, the court shall specify in its order the property to be included in the guardianship estate, and the duties and responsibilities of the guardian appointed under this section will extend only to such property."

19. The Court did not specify any property to be separate from the Voluntary Guardianship's oversight.

20. On March 31, 2021, DEFENDANT SKETCHLEY filed a Petition for Appointment of Voluntary Successor Guardian, requesting DEFENDANT VAN METER serve as Successor Guardian. Paragraph 7 of this Petition stated:

    "The approximate nature of the value of the Petitioner's property is approximately $306,000.00, which includes property in my revocable living trust"

21. On April 15, 2021, the Court granted this Petition, appointing DEFENDANT VAN METER and issuing Letters. The Order referenced "Victor Lambou's property" without specifying any particular property.

22. These documents establish that all property of the Testator, including his revocable living trust, was intended to be under Court supervision, as explicitly stated in both Petitions appointing Guardians of Property.

**TESTATOR'S SOLE SOURCE OF INCOME WAS FEDERAL OPM RETIRMENT FUNDS**

23. The Testator retired from working for the Environmental Protection Agency. Upon retirement he received his annual income solely from OPM Retirement Funds.

24. These Retirement Funds was the sole income source for the Guardianship Estate.

25. From November 1, 2019, to August 20, 2022, Defendant reported various payments and transactions related to Federal OPM retirement funds, including but not limited to:

    a. An initial account balance of $2,657.00 at Centennial Bank;

    b. Federal OPM payments totaling $60,128.06 from November 1, 2019, to November 2, 2020;

    c. Federal OPM payments totaling $57,191.75 from April 15, 2021, to April 16, 2022;

    d. Federal OPM payments totaling $19,256.12 from May 1, 2022, to August 20, 2022.

26. The Ward received two U.S. Treasury payments:
    a. $1,400.00 on March 24, 2021;
    b. $3,786.35 on April 1, 2021.


27. During 2020, the Ward's Federal OPM retirement payments varied significantly, including:
    a. $2,963.21 in November 2019;

b. $3,012.85 in January 2020;
c. $2,969.26 in February, March, and April 2020;
d. $6,392.26 in July 2020;
e. $23,508.25 in October 2020;
f. $3,761.92 in November 2020.

28. Records are missing for the following periods:
a. November 2, 2020, until April 15, 2021;
b. June 1, 2020, to June 30, 2020;
c. December 1, 2020, to December 31, 2020.

29. The Ward's monthly payment was initially reported as $2,900.00 but was later modified to $3,798.36 on August 20, 2022, without explanation or verification of the increase.

**MISMANAGEMENT OF TESTATOR'S PROPERTY**

30. Victor W. Lambou ("Decedent") established a revocable trust that was amended after he had been diagnosed with dementia prior to his death.

31. After the Testator's property was under a guardianships, Anne Van Meter ("Van Meter") took measures concealing information to obtain appointed as Guardian of Property for Decedent and Successor Trustee of Decedent's trust.

32. Howard Kessler, MD ("Kessler"), Van Meter's husband, served as the treating physician for Decedent while also being a creditor of Decedent.

33. Van Meter, as Guardian, managed a homestead property with a stated purchase price of $320,000.00, of which only $314,199.31 was deposited into the trust account.

34. Van Meter, as Guardian, has failed to provide court approval documentation for the use of Guardianship Funds to pay funeral expenses as required under Fla. Stat. Ann. § 744.441(16).

35. Van Meter has failed to provide court approval documentation for disbursements made to attorneys and professional acquaintances as required under Fla. Stat. Ann. § 744.444(16).

36. Van Meter, as Guardian, disposed of Decedent's personal property, including:
a. A 2012 Ford F-150 reportedly valued at $12,000.00 and sold for $14,500.00;
b. A 2000 Chevy Impala valued at $1,000.00;
c. A fishing boat valued at $1,200.00;
d. Home contents valued at $16,000.00; and
e. Horticulture items of significant value.

37. Van Meter has failed to provide verification of the sales proceeds or documentation showing where these funds were deposited.

38. Under Van Meter's guardianship, multiple investment accounts were managed without proper documentation or accounting, including:
    a. A DWS account ending in 1596 with a beginning balance of $60,579.72 as of December 31, 2019;
    b. A Computershare account valued at $3,561.59;
    c. A Citigroup account valued at $440.56;
    d. A St. Paul Travelers account valued at $710.48; and
    e. A Ford Motor account valued at $6,087.92.

39. Van Meter authorized payments to her mother for storage and to friends for various services in violation of Fla. Stat. Ann. § 744.446(2), which prohibits guardians from engaging in split-fee arrangements or paying kickbacks.

40. The trust account managed by Van Meter shows unexplained discrepancies, including:

    a. Missing bank statements from November 19, 2019, to March 10, 2020;
    b. An unexplained decrease in the SunTrust account from $42,893.59 to $301.68;
    c. Unexplained deposits and withdrawals, including a withdrawal of $352,272.06 on or about December 30, 2022.

41. The guardianship account managed by Van Meter contains multiple discrepancies and unexplained transactions, including:
    a. Missing records from November 19, 2011, to March 10, 2020;
    b. Unexplained decreases in account balances;
    c. Unaccounted deposits and withdrawals.

42. Van Meter failed to provide notice to the beneficiaries of the Trust prior to changing the Trust to name herself as successor Trustee during the guardianship.

43. To date, Van Meter has failed to provide complete accounting, reports, and full disclosure of Decedent's assets to the Personal Representatives as required under Fla. Stat. Ann. § 733.607(1).

44. On October 11, 2019, the same day the Petition for Guardianship was filed, Defendants Van Meter and Kessler improperly attempted to bind the Ward to a contract for reimbursing Defendant Kessler's expenses.

45. On October 12, 2019, Defendant Kessler executed a contract purporting to bind the Ward to Cherry Laurel fees without proper legal authority to do so.

46. On December 26, 2019, Defendants Van Meter and Sketchley caused the Ward to execute documents replacing himself as Trustee with Defendant Van Meter over his Trust.

47. Between January 2020 and November 2020, Defendant Helfand made multiple unauthorized disbursements from the Guardianship Estate, including but not limited to:

      A. $136.00 to Defendant Kessler on January 2, 2020
      B. $3,537.00 to Defendant Kessler for "reimbursements" on January 3, 2020

> C. $5,028.39 to Defendant Sketchley for legal fees on January 20, 2020
> D. $1,012.00 to Jill Rowan for ward evaluation on May 4, 2020
> E. $294.21 to Defendant Kessler for "reimbursements" on August 19, 2020
> F. $324.14 to Defendant Kessler on September 30, 2020
> G. $5,793.39 to Defendant Sketchley on November 3, 2020
> H. $204.00 to Defendant Kessler for "reimbursements" on November 3, 2020

48. On August 22, 2020, Defendant Kessler obtained Ward's signature on a Healthcare Surrogate Form that was not properly executed. Despite its improper execution, Defendant Kessler subsequently used this document to:
    a. Make healthcare decisions for the Ward
    b. Petition the Court for reimbursements

49. On October 16, 2020, Defendants Kessler and Van Meter improperly contracted with the Ward for fee reimbursements while the guardianship was in effect.

50. On March 7, 2021, Defendant Van Meter sold Ward's homestead property without proper authorization.

51. Between 2019 and 2022, Defendants Van Meter and Kessler relocated the Ward to four different facilities without proper legal authority as Guardian of Person, relying on unexecuted documents.

52. Defendants made numerous unauthorized disbursements from the Trust Estate, including but not limited to:
    a. $12,369.48 to Defendant Van Meter on January 18, 2022
    b. $1,257.06 to Defendant Kessler on January 18, 2022
    c. $3,202.36 for Guardianship Living Expenses on January 25,

2022

    d. $7,515.00 to a funeral home on August 19, 2022

53. The total unauthorized attorney fees and payments made without

court approval amount to approximately $41,223.79.

54. Defendants concealed numerous transactions from the Court,

including:

a. $4,495.35 paid by the Guardianship Estate

b. Multiple transactions through a newly opened Truist Bank

account #5342

c. Various undisclosed disbursements from the Trust bank

statements between March 10, 2020, and February 21, 2022

55. On January 13, 2023, the Court issued orders based on fraudulent
representations regarding:
    a. Howard Kessler's status as Healthcare Surrogate, resulting in an
order for $8,540.29
    b. Anne Van Meter's position as Successor Guardian, resulting in
an order for $12,369.48

56. Between February 22, 2022, and April 26, 2022, Defendants made

suspicious payments totaling $251,820.52 to an undisclosed

assisted living facility (ALF), with irregular payment amounts

suggesting an attempt to conceal the nature of these transactions.

**TRUST ACCOUNT MANAGEMENT AND FINANCIAL
IRREGULARITIES**

57. DEFENDANT VAN METER failed to maintain transparency regarding guardianship and trust accounting records. She transferred funds to a newly established Trust Account without providing proper accounting to the Court. Prior to Trust Account #4358, records show:

    A. Unaccounted money
    B. Missing checks
    C. Selective provision of payment documentation
    D. Unauthorized ATM withdrawals with no documented purpose
    E. Guardianship expenses paid through Trust Account #4358

58. On January 9, 2022, DEFENDANT VAN METER transferred $353,272.06 from Truist Bank Account #4358 to a "new" trust checking account (Truist Bank Trust Account #5342). She failed to provide accounting for this new account. The undisclosed accounting contains evidence of unauthorized payments to:

    A. ANNE VAN METER for guardianship services
    B. DEFENDANT KESSLER, M.D., for guardianship services
    C. DEFENDANT JOHNSON, without court approval

59. DEFENDANT VAN METER failed to maintain transparency regarding guardianship and trust accounting records. She transferred funds to a newly established Trust Account without

providing proper accounting to the Court. Prior to Trust Account #4358, records show:

    A. Unaccounted money
    B. Missing checks
    C. Selective provision of payment documentation
    D. Unauthorized ATM withdrawals with no documented purpose
    E. Guardianship expenses paid through Trust Account #4358

60. On January 9, 2022, DEFENDANT VAN METER transferred $353,272.06 from Truist Bank Account #4358 to a "new" trust checking account (Truist Bank Trust Account #5342). She failed to provide accounting for this new account. The undisclosed accounting contains evidence of unauthorized payments to:

    A. ANNE VAN METER for guardianship services
    B. DEFENDANT KESSLER, M.D., for guardianship services
    C. DEFENDANT JOHNSON, without court approval

**ACTIONS DURING GUARDIANSHIP AND UNAUTHORIZED ACTIVITIES**

61. Between August 2019 and August 2022, DEFENDANT KESSLER, M.D. engaged in unauthorized medical activities including:

    A. Signing medication lists as if he were the treating physician
    B. Calling in prescriptions to pharmacies as the Testator's provider

    C. Representing himself as the Testator's healthcare surrogate without court authorization

    D. Making medical decisions without proper authority

62. On October 12, 2019, DEFENDANT KESSLER, M.D. executed the following unauthorized actions:

    A. Signed a contract with Cherry Laurel on behalf of the Testator

    B. Listed himself as the only family contact

    C. Omitted PLAINTIFFS DENITA, VICKI, and GERALYN from all documentation

    D. Received an undisclosed $750 referral fee from Cherry Laurel

63. On December 4, 2019, DEFENDANT KESSLER, M.D., through his wife DEFENDANT VAN METER (who was later appointed Trustee on December 26, 2019), initiated unauthorized real estate transactions by:

    A. Contacting real estate brokers about selling the Testator's homestead

    B. Planning property disposition without court approval

    C. Acting outside the scope of a voluntary property guardianship

**FINANCIAL IRREGULARITIES AND COMPENSATION**

64. DEFENDANT KESSLER, M.D. submitted false claims for compensation including:

      A. Billing for healthcare surrogate services never authorized by the Court
      B. Claiming payments to DEFENDANT HEULER that were actually paid by the Estate
      C. Receiving undisclosed referral fees from facilities
      D. Executing contracts with his political supporters using the Testator's funds

65. The combined DEFENDANTS' claims against the Estate total approximately 50% of the Testator's assets, which were valued at approximately $360,000 at the time of death, including:

      A. DEFENDANT SKETCHLEY's request for 20% of the estate ($68,535.00)
      B. Unauthorized payments to DEFENDANT KESSLER for alleged healthcare surrogate services
      C. Payments to DEFENDANT VAN METER for guardianship services
      D. Additional creditor claims from other DEFENDANTS

**UNAUTHORIZED MEDICAL AND HEALTHCARE DECISIONS**

66. From August 2019 through August 2022, DEFENDANT KESSLER, M.D. engaged in unauthorized medical activities including:

      A. Representing himself as the Testator's treating physician without legal authority
      B. Signing medication lists as if he were the primary care provider
      C. Calling in prescriptions to pharmacies without proper medical authorization
      D. Making medical decisions without court approval or legal standing

    E. Falsely claiming healthcare surrogate status in medical documentation

67. DEFENDANT KESSLER, M.D. and DEFENDANT VAN METER systematically isolated the Testator by:

    A. Restricting family access and communication
    B. Controlling all medical appointments and decisions
    C. Redirecting mail to their personal address
    D. Making unilateral decisions about the Testator's living arrangements
    E. Preventing family participation in healthcare decisions

**FINANCIAL EXPLOITATION AND MISREPRESENTATION**

68. The combined actions of DEFENDANTS have resulted in approximately 50% depletion of the Testator's estate through:

    A. Unauthorized payments for alleged healthcare surrogate services
    B. Undisclosed referral fees from facilities ($750 from Cherry Laurel)
    C. Unauthorized contracts with DEFENDANT KESSLER's political supporters
    D. Guardianship fees without proper court approval
    E. Trust management fees without proper accounting

69. Financial irregularities documented include:

    A. Missing checks and incomplete accounting records
    B. Unauthorized ATM withdrawals from Trust Account #4358
    C. Transfer of $353,272.06 to new trust account (Truist Bank Trust Account #5342) without proper documentation
    D. Payments to DEFENDANTS without court approval
    E. Duplicate billing and falsified service claims

## DAMAGE TO ESTATE AND BENEFICIARIES

70. The Estate and Beneficiaries have suffered substantial harm through:

    A. Reduction of estate value from approximately $500,000 to $360,000
    B. Loss of Testator's homestead property
    C. Deprivation of family relationships and traditions
    D. Unauthorized disposal of personal property
    E. Legal fees and costs incurred to challenge improper actions

## UNAUTHORIZED CONTRACTS AND PROPERTY DISPOSITIONS

71. Between August 2019 and August 2022, DEFENDANTS executed unauthorized contracts including:

    A. Cherry Laurel facility contract signed by DEFENDANT KESSLER without authority
    B. Real estate listing agreements initiated without court approval
    C. Healthcare service agreements without proper authorization
    D. Property management contracts without guardianship court oversight

72. DEFENDANTS disposed of the Testator's property without proper authority by:

    A. Selling the homestead property against Testator's documented wishes
    B. Disposing of personal property without inventory or accounting

    C. Removing horticulture projects and research materials

    D. Selling or disposing of the Testator's dog, Fauna, without family consultation

## PATTERN OF DECEPTIVE PRACTICES

73. DEFENDANTS engaged in a pattern of deceptive practices including:

    A. Filing documents in Leon County rather than Wakulla County to avoid detection

    B. Making false statements about PLAINTIFF GERALYN's relationship with the Testator

    C. Misrepresenting Adult Protective Services findings

    D. Preventing court-ordered capacity evaluations

    E. Withholding accounting records and financial documentation

## DAMAGES AND FINANCIAL IMPACT

74. The Estate has been depleted from approximately $500,000 to $360,000 through:

    A. Unauthorized payments to DEFENDANTS

    B. Undisclosed facility referral fees

    C. Duplicative billing for services

    D. Unauthorized ATM withdrawals

    E. Payment of guardianship expenses through trust accounts without court approval

75. Additional damages include:

    A. Loss of homestead property value

    B. Unauthorized disposal of personal property

    C. Legal fees incurred to challenge improper actions

D. Emotional distress to family members
E. Loss of family relationships and traditions

**DAMAGE TO ESTATE AND INTERFERENCE WITH FAMILY RELATIONSHIPS**

76. From August 2019 through August 2022, DEFENDANTS

    systematically:

    A. Prevented family contact with the Testator
    B. Redirected mail to DEFENDANTS' personal addresses
    C. Removed family photos and personal items from Testator's residence
    D. Blocked family participation in medical decisions
    E. Prevented family involvement in care decisions
    F. Restricted access to the Testator during holidays and special occasions

77. DEFENDANTS caused substantial financial harm to the Estate through:

    A. Unauthorized payments to service providers
    B. Undocumented ATM withdrawals
    C. Missing checks and incomplete financial records
    D. Payment of guardianship expenses through trust accounts
    E. Duplicate billing for services
    F. Unauthorized contracts with third parties

**MISREPRESENTATION AND FALSE STATEMENTS**

78. DEFENDANT SKETCHLEY made material misrepresentations

    to the Court including:

a. False statements regarding PLAINTIFF GERALYN's relationship with the Testator
b. Inaccurate representations about Adult Protective Services findings

c. Misstatements about prior payments received ($4,600.00 claimed vs. actual payments of $5,172.23, $5,793.39, and $5,028.35)
d. Incorrect characterizations of family relationships
e. False claims regarding exploitation investigations

79. DEFENDANT KESSLER, M.D., engaged in unauthorized medical activities by:

a. Representing himself as the Testator's treating physician without authority
b. Calling in prescriptions without proper medical authorization
c. Signing medication lists without legal authority
d. Making medical decisions without court approval
e. Falsely claiming healthcare surrogate status

**FINAL ACCOUNTING AND ESTATE DEPLETION**

80. The combined actions of DEFENDANTS resulted in:

a. Reduction of estate value from $500,000.00 to approximately $360,000.00
b. Claims against the estate totaling approximately 50% of remaining assets
c. Loss of Testator's personal property and research materials
d. Unauthorized disposal of family heirlooms and memorabilia
e. Depletion of trust accounts without proper documentation or court approval

**PLAINTIFF'S COGNITIVE DECLINE AND MEDICAL CONDITION**

81. On or about August 14-15, 2019, Plaintiff was initially evaluated by Dr. Paul Katz, MD, who diagnosed Plaintiff with dementia. During this initial evaluation:
a. Plaintiff demonstrated significant decline in short-term

memory
    b. Plaintiff's cognitive testing revealed a MOCA score of 19/30
    c. Dr. Katz noted safety issues were present
    d. Dr. Katz prescribed Aricept (Donepezil) for treatment

82. On August 20, 2019, Plaintiff underwent a head CT scan due to cognitive impairment, performed by J. Kirkland, RT.

83. Between August 21, 2019, and March 16, 2021, Plaintiff was prescribed multiple medications for his condition, including:
    a. Ativan (tranquilizer)
    b. Eliquis
    c. Entresto

84. On August 28, 2019, during a follow-up appointment with Dr. Katz:
    a. Plaintiff's daughter Geralyn was present
    b. Plaintiff agreed to allow his daughter more oversight of finances and home care
    c. Dr. Katz documented continued decline in short-term memory

85. On October 1, 2019:
    a. Plaintiff was admitted to Tapestry
    b. Dr. Howard Kessler became involved in Plaintiff's care
    c. Medical records documented paranoid thinking about Plaintiff's daughter

86. On December 3, 2019, Dr. Katz noted:
    a. Plaintiff was 90 years old with progressive dementia
    b. No Power of Attorney was in place
    c. Dr. Kessler assumed responsibility for medication management

87. By February 18, 2020:
    a. Plaintiff was no longer able to drive
    b. Medical providers strongly encouraged appointment of Power of Attorney
    c. Plaintiff required weekly caregiving services

88. On July 21, 2020, medical records document an ongoing legal battle with Plaintiff's daughters, with Dr. Kessler providing support and medication management.

89. By March 16, 2021, at age 91, Plaintiff required appropriate

supportive housing due to his condition.

90. On May 8, 2021, Plaintiff was referred for:
    a. Medication management
    b. Speech therapy for cognition
    c. Hygiene assistance
    d. Home health aide services

91. On May 12-13, 2021:
    a. Speech Therapist Ana Raynolds evaluated Plaintiff
    b. Plaintiff's MOCA score had declined to 16/30
    c. Plaintiff demonstrated inability to leave home
    d. Significant cognitive-linguistic deficits were documented

92. Between June 1-3, 2021, medical records document:

    a. Further decline in Plaintiff's MOCA score to 12/30

    b. Multiple diagnoses including:

    i. Atrial fibrillation

    ii. Dementia

    iii. Congestive heart failure

    iv. Aortic stenosis

    c. Medical determination that Plaintiff could not return to his house

93. From August 2019 to June 2021, Plaintiff's cognitive decline is

    evidenced by progressive deterioration in MOCA scores:

    a. August 2019: 19/30

    b. May 2021: 16/30

    c. June 2021: 12/30

94. On or about August 15, 2019, Victor W. Lambou ("Patient") began experiencing symptoms of dementia, with a documented family history of the condition.

95. As of July 12, 2021, Patient was diagnosed with unspecified dementia (ICD Code F03.90), with symptoms that were controlled with difficulty and affecting daily functioning, requiring ongoing monitoring.

96. On July 13, 2021, Patient underwent cognitive assessment, during which he scored 18 out of 30 on the Montreal Cognitive Assessment (MoCA), indicating moderate cognitive-linguistic deficits.

97. Patient exhibited significant memory deficits, including:

a. Failure to recognize familiar persons and places

b. Inability to recall events of the past 24 hours

c. Memory loss severe enough to require supervision

98. On July 13, 2021, Patient scored 2 on the Mini-Cog assessment, indicating likely cognitive impairment, specifically demonstrating deficits with numeric values, clock setting, and word recall.

99. Patient's medical history included aortic valve stenosis, osteoarthritis, hypertension, glaucoma, and dementia.

100.    Despite being offered the opportunity by the Home Health Agency, Patient declined to designate a surrogate decision-maker during this period.

101.    Howard Kessler, identified as a friend, was listed as Patient's primary contact.

102.    By January 7, 2022, Patient's cognitive condition had deteriorated, as evidenced by a decreased MoCA score of 12 out of 30.

103.    On March 1, 2022, Howard Kessler was acting as Patient's Power of Attorney (POA), as documented in medical records by Dr. Paul Katz, MD.

104.    On March 18, 2022, medical records confirm Howard Kessler's status as POA for Patient, who was then 92 years old.

105.    Patient's cognitive decline was further evidenced on July 15, 2022, when he provided multiple incorrect statements about his living situation and family circumstances, including false statements about:

a. Having a POA named Geralyn

b. Living on 10 acres

c. Having a 65-year-old wife

106.    On August 15, 2022, Howard and Anne Kessler, acting as Patient's POAs, authorized his transfer to a Skilled Nursing Facility for rehabilitation.

107.    Throughout this period, Patient resided at various facilities including Cherry Laurel and Westminster Oaks, and maintained a connection to 408 Plantation Road, identified as the Kesslers' address.

108.    Patient's Medicare number during this period was 1YJ9HX9RY25.

**UNAUTHORIZED TRANSACTIONS, BREACH OF FIDUCIARY DUTY, AND MISAPPROPRIATION OF GUARDIANSHIP ASSETS**

109. On or about October 11, 2019, Defendants VAN METER and HELFAND made decisions regarding the Ward on the same day the Petition for Guardianship was filed, without proper authority or court approval.

110.    Between October 2019 and April 2022, Defendants VAN METER and HELFAND engaged in a pattern of unauthorized financial transactions and decisions regarding the Ward's estate, including but not limited to:

a. Making unauthorized payments totaling $41,223.79 to various attorneys and service providers without required court approval, in violation of §744.411 and §744.108;

b. Executing contracts binding the Ward without legal authority to do so, including:

a. An October 12, 2019 contract binding the Ward to Cherry Laurel fees

b. An October 16, 2020 contract for reimbursement of fees while a guardianship was in effect

c. Improperly moving the Ward between facilities four (4) times between 2019-2022, relying on unexecuted documents when neither defendant had authority as Guardian of Person;

d. Making unauthorized payments from both the Guardianship Estate and Trust Estate, including:

c. $4,495.35 to Howard Kessler
d. $15,994.01 to Twyla Sketchley, Esq.
e. $12,369.48 to Anne Van Meter
f. $5,011.00 to William Johnson, Esq.
g. $6,553.43 to Victoria Heuler, Esq.
h. $3,170.00 to Attorney Richardson
i. $1,000.00 to Attorney Solomon

111.    Defendant VAN METER engaged in unauthorized sale of the

Ward's assets, including:

a. The sale of the Ward's homestead property on or about March 7,

2021 without proper authority

b. The sale of vehicles, boats, tractors, furnishings and other

personal property without required court approval

112.    Between February 22, 2022 and April 26, 2022, Defendant

VAN METER made additional unauthorized payments totaling

$25,820.52 to various undisclosed recipients without court

approval.

113.    Defendants opened new accounts at Truist Bank (#5342)

without proper authorization or accounting for the funds therein.

114.    The above actions were taken without required court approval

and in violation of Florida Guardianship statutes, including but not

limited to §744.411 and §744.108.

115.    On or about March 15, 2023, DEFENDANT VAN METER, in

her capacity as Successor Guardian of Property, did knowingly and

wrongfully deplete Guardianship Estate account #1861 to a zero

balance, as evidenced by the Final Accounting filed on said date.

116.    Between February 22, 2022, and April 26, 2022, DEFENDANT

VAN METER did wrongfully authorize and/or facilitate payments

totaling $25,820.52 to a confidential Assisted Living Facility (ALF),

including but not limited to:

a. Payment of $1,000.00 on February 22, 2022

b. Payment of $2,738.87 on March 18, 2022

c. Payment of $2,000.00 on March 18, 2022

d. Payment of $5,079.54 on April 7, 2022

e. Payment of $2,536.76 via Check #1208 on April 18, 2022

f. Payment of $3,708.00 via Check #1209 on April 18, 2022

g. Payment of $5,049.35 via Check #1213 on April 26, 2022

117.    Following the depletion of the Guardianship Estate,

DEFENDANT VAN METER did knowingly and without court

approval:

a. Commingle Guardianship Funds with Trust Funds

b. Make unauthorized payments from the Trust Account

c. Fail to maintain Trust-Protected Property in a separate account

as required by law

118.    DEFENDANT VAN METER has improperly handled Federal

Funds without requisite Federal approval.

119.    Multiple DEFENDANTS have wrongfully sought fees from the

depleted Guardianship Estate, including:

a. DEFENDANT HELFAND, seeking $5,400.00 as Guardian of

Property

b. DEFENDANT VAN METER, seeking $9,282.81 as Successor

Guardian of Property

c. DEFENDANT VAN METER, seeking an additional $5,630.00 as

Successor Trustee

d. DEFENDANT JOHNSON, ESQ., seeking $10,013.55 as Attorney

for Successor Guardian and Howard Kessler

e. DEFENDANT SKETCHLEY, seeking $69,334.50 as Attorney for

the Ward

f. DEFENDANT KESSLER, M.D., seeking $40,293.75 as an

unauthorized party claiming to be Health Care Surrogate

120.    DEFENDANTS VAN METER and KESSLER, M.D., did

knowingly and wrongfully:

a. Misrepresent themselves as family members of the Testator

b. Assert unauthorized decision-making power over the Testator's

person, social life, and residence

c. Orchestrate four (4) unnecessary facility transfers

d. Cause the unnecessary expenditure of over $100,000.00

e. Deliberately isolate the Testator from family and friends

f. Execute these actions despite PLAINTIFF GERALYN's established

role as primary caregiver in the Testator's fully-paid homestead

property

121.    On or about October 12, 2019, Defendant Howard Kessler

completed paperwork for Ward's transfer to Cherry Laurel facility,

initiating a 13-month residency period at a cost of $37,300.

122.    Between April 9, 2021, and January 4, 2022, Ward was

transferred to Tapestry facility, where monthly payments of

$3,060.00 were made through December 2021, increasing to

$3,185.00 per month thereafter, totaling approximately $68,275.00

for this period.

123.    On or about January 7, 2022, Defendant Anne VanMeter

completed transfer paperwork for Ward's relocation to Westminster

Oaks facility.

124.    Defendant VanMeter utilized unexecuted Healthcare Surrogate

Forms and Letters of Guardianship of Property to facilitate transfers

and financial transactions.

125.    Between March and August 2022, payments for Ward's care at Westminster Oaks ranged from $2,738.87 to $5,079.54 monthly, totaling $28,015.81 for this six-month period.

126.    Property taxes for Ward's homestead property on Pine Lane for 2019 and 2020 totaled $4,157.37.

127.    Eviction-related costs totaled $3,200.00, comprising payments of $1,000.00, $250.00, and $1,920.00.

128.    Storage costs related to Guardian VanMeter's mother amounted to $770.00.

129.    Moving expenses incurred on January 3, 2020, totaled $3,537.00.

130.    Homeowners insurance through American Integrity cost $3,284.00 annually.

131.    The total cost of Ward's care under guardianship for the two-year period amounted to $113,282.93, representing an increase of approximately $100,000.00 over what costs would have been had Ward remained in his home under his daughter's care.

132.    Defendant VanMeter failed to maintain transparency regarding guardianship and trust accounting records, specifically:

a. Transferred Trust Account funds to a newly established Trust

Account without providing required accounting to the Court;

b. Failed to account for various transactions from Trust Account #4358;

c. Made unauthorized ATM withdrawals from Trust Account #4358;

d. Used Trust Account #4358 for guardianship expenses without proper authorization.

133.    On or about January 9, 2022, Defendant VanMeter transferred $353,272.06 from Trust Account #4358 to a new Truist Bank Trust Account #5342, for which she has failed to provide any accounting to the Court.

134.    Defendant VanMeter made unauthorized payments from the Trust Bank Account to herself, Defendant Kessler, M.D., and Defendant Johnson for guardianship services without court approval.

**COMPLAINTS SUBMITTED TO FLORIDA DEPARTMENT OF HEALTH**

135.    Complaints were filed and submitted to the Florida Department of Health. However, nothing was pursued to investigate the allegations submitted on behalf of the licensed physicians.

## COMPLAINTS SUBMITTED TO THE FLORIDA BAR ASSOCIATION

136.    Complaints were filed and submitted to The Florida Bar against the attorneys who engaged in these actions.  However, nothing was pursued to investigate the allegations submitted on behalf of the licensed attorneys.

## FAILURE OF THE LEON COUNTY CLERK OF COURT TO AUDIT

137.    Multiple emails were sent to the Leon County Clerk of Court requesting an audit of the accounting. Additionally, Leon County Clerk of Court was added to the eportal system to get notice of all the filings occurring in the guardianship case. However, no response or further investigation was pursued.

## CLAIMS

### FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(c) Against All Defendant Collaborators)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

1. Plaintiffs are a "person" within 18 U.S.C. §§ 1961(3) and 1964(c) and "capable of holding a legal or beneficial interest in property and were injured by reason of the "racketeering activity" within 18 U.S.C. 1961(1).

2. Each of the Defendant **Collaborators** is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c) and is "capable of holding legal or beneficial interest in the property."

3. The **Sham Guardianship/Probate Enterprise** is an "enterprise" within 18 U.S.C. §§ 1964(4) and 1962(c) that was engaged in, and the activities of which affected interstate commerce within 18 U.S.C. §§ 1961(4), 1962(c). The Scheme to Defraud had an effect on interstate commerce as described above.

a. Each of the Defendant **Collaborators** was employed by or associated with, or participated in the affairs of the **Sham Guardianship/Probate Enterprise** and they conducted and participated, directly or indirectly, in the management and operation of the affairs of the **Sham Guardianship/Probate Enterprise** and through a "pattern of racketeering activity" within 18 U.S.C. §§ 1961(1) and (5) and 1962(c), to wit" multiple, repeated and continuous violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. §1943 (wire fraud) and multiple violations of Florida Code§ 836.05. (extortion).

4. Plaintiffs suffered (and will continue to suffer) substantial injury to their "business and property" by reason of the violations of 18 U.S.C. § 1962(c) committed by Defendant **Collaborators.** All of Plaintiffs' damages were anticipated as a substantial factor and natural consequence of their pattern of "racketeering activity."

## SECOND CLAIM FOR RELIEF

**(Violations of 18 U.S.C. § 1962(d), Conspiracy to Violate§ 1962(c) Against all Defendant Collaborators)**

1. The Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

2. 18 U.S.C. § 1962(d) provides:

3. It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**4.** Plaintiffs were a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), were "capable of holding a legal or beneficial interest in property," and were injured by reason of the "racketeering activity within 18 U.S.C. § 1961(1) of the Defendant **Collaborators.**

5. Each of the Defendant **Collaborators** is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c) and (d), and each is an "entity capable of holding a legal or beneficial interest in property."

6. The **Sham Guardianship/Probate Enterprise** constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) that was engaged in, and the activities of which affected, interstate commerce.    The Defendant **Collaborators** were employed by or associated with the management and operation of the affairs of the **Sham Guardianship/Probate Enterprise.**

7. The Defendant **Collaborators** conspired among themselves within 18 U.S.C. § 1962(d) to conduct, operate and manage the affairs of the **Sham Guardianship/Probate Enterprise,** directly or indirectly, by engaging in a "pattern of racketeering activity" within 18 U.S.C. § 1961(1) in violation of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and Florida Code § 836.05. (extortion).

8. The Defendant **Collaborators** acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1) and 1962(c) would proximately and directly cause Plaintiffs to suffer damages to their "business and property" within 18 U.S.C. § 1964(c). All of Plaintiffs' damages were reasonably foreseeable by the Defendant **Collaborators** and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. 1961(1).

## THIRD CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) Conspiracy to Violate§ 1962(a)
### Against Defendant Collaborators)

The Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

1. 18 U.S.C. § 1962(a) provides:

2. It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

3. 18 U.S.C. § 1962(d) provides:

4. It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section.

5. Plaintiffs are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), each "capable of holding a legal or beneficial interest in property," and were injured by reason of the "racketeering activity" within 18 U.S.C. § 1961(1) of the Defendant **Collaborators.**

6. Each of the Defendant **Collaborators** is a "person" under 18 U.S.C. §§ 1961(3) and 1962(a) and (d) and is "capable of holding a legal or beneficial interest in property."

7. The **Sham Guardianship/Probate Enterprise** constituted an "enterprise" within 18 U.S.C. §§ 1961(4) and 1962(a) that was engaged in, and the activities of which affected, interstate commerce.

8. The Defendant **Collaborators** conspired among themselves within 18 U.S.C. § 1962(d) to violate§ 1962(a), to wit, the Defendant **Collaborators** conspired among themselves to establish and operate, and use and invest income, or the proceeds of income, from a "pattern of racketeering activity" within 18 U.S.C. § 1961(5) in which the Defendant **Collaborators** participated as principals within 18 U.S.C. §§ 1961(1), 1961(5), 1962(a) and (d), to wit: multiple, repeated, and continuous violations of 18 U.S.C. §1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and Florida Code§ 836.05 (extortion).

9. The Defendant **Collaborators'** conspiracy was and is that income, or the proceeds of income, from "racketeering activity" within 18 U.S.C. § 1961(1) received by the Defendant **Collaborators** would be invested in or used in the establishment and operation of the **Sham Guardianship/Probate Enterprise**

10. The Defendant **Collaborators** acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(a) would proximately and directly cause Plaintiffs to suffer damages to their "business and property" within 18 U.S.C. § 1964(c). All of Plaintiffs' damages were reasonably foreseeable by the Defendant **Collaborators** and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

## **FOURTH CLAIM**
Violation of Anti-Kickback Statute

42 U.S.C. § 1320a-7b(b)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

Plaintiffs allege that Defendant Howard Kessler, M.D. violated the

Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) through the

following actions:

1. PARTIES AND REMUNERATION

    Defendant Howard Kessler, M.D., serving as a licensed Florida

    medical doctor with a leading role on a capacity evaluations

examination committee, knowingly and willfully solicited and received a $750 referral fee from Cherry Laurel assisted living facility in exchange for referring Victor W. Lambou, a Medicare/Federal OPM benefits recipient.

2. SPECIFIC CONDUCT AND INTENT

On October 12, 2019, Defendant Kessler executed a contract with Cherry Laurel on behalf of Victor W. Lambou, wherein:

a) He listed himself as the only family contact

b) Deliberately omitted the legitimate family members (Plaintiffs Denita, Vicki, and Geralyn)

c) Received an undisclosed $750 kickback payment labeled as a "referral fee"

d) Knowingly concealed this payment from the Court and the ward's family

3. FEDERAL PROGRAM CONNECTION

The referral involved services paid for by federal healthcare programs, specifically:

a) The ward's care was funded through Federal OPM Retirement Funds

b) The ward received Medicare benefits

c) The assisted living facility services were eligible for federal healthcare program reimbursement

4. PATTERN OF CONDUCT

This kickback arrangement was part of a larger scheme wherein Defendant Kessler:

a) Made unauthorized medical decisions for the ward

b) Called in prescriptions without proper authority

c) Executed contracts with political supporters using the ward's funds

d) Engaged in additional undisclosed financial arrangements with healthcare providers

5. IMPACT ON FEDERAL PROGRAMS

This kickback scheme resulted in:

a) Improper influence over healthcare decisions affecting a federal benefits recipient

b) Unnecessary costs to federal healthcare programs

c) Compromise of medical decision-making

d) Exploitation of approximately 50% of the ward's estate valued at $360,000

WHEREFORE, Plaintiffs request:

1. Treble damages of the amount paid by federal healthcare programs

2. Civil penalties as provided by law

3. Disgorgement of all kickbacks received

4. Such other relief as the Court deems just and proper

## **FOURTH CLAIM**

Violation of Stark Law in Healthcare

42 U.S.C. 1395

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

Plaintiffs allege that Defendant Howard Kessler, M.D. violated the Stark Law through the following conduct:

1. FINANCIAL RELATIONSHIP

   Defendant Howard Kessler, M.D. maintained prohibited financial relationships with Cherry Laurel assisted living facility while simultaneously making referrals to this entity, specifically:

   a) Received a $750 kickback payment labeled as a "referral fee"

on October 12, 2019

b) Executed contracts with Cherry Laurel for services while maintaining a financial interest

c) Engaged in ongoing compensation arrangements with the facility

2. REFERRALS FOR DESIGNATED HEALTH SERVICES

Between October 2019 and August 2022, Defendant Kessler:

a) Made referrals to Cherry Laurel for services covered by Medicare/Federal OPM benefits

b) Prescribed medications and ordered medical services while having a financial interest

c) Directed patient placement decisions while receiving compensation

d) Arranged for designated health services while maintaining improper financial relationships

3. ABSENCE OF APPLICABLE EXCEPTIONS

The financial relationships between Defendant Kessler and Cherry Laurel:

a) Did not qualify under any Stark Law exceptions

b) Exceeded fair market value for any legitimate services

c) Were not properly documented or disclosed

d) Failed to meet requirements for personal service arrangements

4. CLAIMS SUBMISSION AND FEDERAL PROGRAM IMPACT

These violations resulted in:

a) Submission of claims to Medicare and Federal OPM programs for designated health services

b) Improper billing for services referred by Defendant while having a financial interest

c) Charges to federal healthcare programs for services stemming from prohibited referrals

d) Approximately $251,820.52 in suspicious payments to undisclosed assisted living facilities

5. PATTERN OF PROHIBITED CONDUCT

Defendant Kessler engaged in systematic violations by:

a) Acting as both referring physician and financial beneficiary

b) Making unauthorized medical decisions while having financial interests

c) Concealing financial relationships from the Court and

beneficiaries

d) Directing healthcare services while receiving compensation

WHEREFORE, Plaintiffs request:

1. Damages equal to the amount claimed in violation of the Stark Law

2. Civil monetary penalties for each improper claim submitted

3. Disgorgement of all profits from prohibited financial relationships

4. Such other relief as the Court deems just and proper

## CLAIM FOR RELIEF
18 U.S.C. §666 Theft and Bribery

(Theft/Embezzlement Concerning Programs Receiving Federal Funds)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

Plaintiffs allege that Defendants violated 18 U.S.C. § 666 through the following conduct:

1. FEDERAL PROGRAM JURISDICTION

The estate and guardianship of Victor W. Lambou qualified

under 18 U.S.C. § 666 because:

a) The ward received Federal OPM Retirement Funds as his

sole source of income

b) These federal benefit payments exceeded $10,000 annually,

including:

- $60,128.06 from November 1, 2019, to November 2, 2020

- $57,191.75 from April 15, 2021, to April 16, 2022

- $19,256.12 from May 1, 2022, to August 20, 2022

2. AGENTS AND FIDUCIARIES

Defendants acted as agents of an organization receiving federal

benefits:

a) Anne Van Meter served as Guardian of Property

b) Howard Kessler, M.D. acted as healthcare decision-maker

c) Leonard Helfand served as initial Guardian of Property

d) All defendants maintained fiduciary responsibilities over

federal funds

3. THEFT AND EMBEZZLEMENT

Defendants misappropriated property valued at more than

$5,000 through:

a) Unauthorized disbursements exceeding $71,223.79 without court approval

b) Suspicious payments totaling $251,820.52 to undisclosed assisted living facilities

c) Undocumented transfers, including $352,272.06 on December 30, 2022

d) Conversion of the ward's assets valued at approximately $500,000

4. SPECIFIC FRAUDULENT TRANSACTIONS

Defendants engaged in numerous fraudulent transactions, including:

a) $750 kickback payment from Cherry Laurel disguised as a "referral fee"

b) Multiple unauthorized reimbursements to Defendant Kessler totaling $5,752.70

c) Undisclosed disbursements from Trust bank statements between March 2020 and February 2022

d) Fraudulent claims resulting in court orders for $8,540.29 and $12,369.48

5. INTENTIONAL MISCONDUCT

Defendants demonstrated knowing and willful intent through:

a) Concealment of transactions from the Court and beneficiaries

b) Creation of false documentation to obtain payments

c) Deliberate omission of legitimate family members from legal documents

d) Systematic isolation of the ward to maintain control over federal funds

WHEREFORE, Plaintiffs request:

1. Damages equal to the amount of federal funds misappropriated

2. Civil monetary penalties as provided by law

3. Disgorgement of all ill-gotten gains

4. Such other relief as the Court deems just and proper

### CLAIM FOR RELIEF
18 U.S.C. §641 Theft of Government Property
(Theft of Government Property/Federal Funds)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

Plaintiffs allege that Defendants violated 18 U.S.C. § 641 through the following conduct:

1. FEDERAL PROPERTY JURISDICTION

   The property at issue consisted of Federal OPM Retirement Funds belonging to the United States government:

   a) Federal OPM payments totaling $60,128.06 (November 1, 2019 - November 2, 2020)

   b) Federal OPM payments totaling $57,191.75 (April 15, 2021 - April 16, 2022)

   c) Federal OPM payments totaling $19,256.12 (May 1, 2022 - August 20, 2022)

   d) Additional U.S. Treasury payments of $1,400.00 and $3,786.35 in 2021

2. KNOWING AND WILLFUL CONVERSION

   Defendants knowingly converted these federal funds through:

   a) Unauthorized disbursements exceeding $71,223.79 without court approval

   b) Undocumented transfers, including $352,272.06 on

December 30, 2022

c) Concealment of transactions from the Court and beneficiaries

d) Creation of false documentation to obtain payments

3. SPECIFIC ACTS OF CONVERSION

Defendants converted federal funds through:

a) $750 kickback payment from Cherry Laurel disguised as a "referral fee"

b) Multiple unauthorized reimbursements to Defendant Kessler totaling $5,752.70

c) Suspicious payments totaling $251,820.52 to undisclosed assisted living facilities

d) Unauthorized attorney fees and payments totaling $41,223.79

4. INTENT TO DEPRIVE

Defendants demonstrated specific intent through:

a) Systematic isolation of the ward to maintain control over federal funds

b) Deliberate omission of legitimate family members from legal documents

c) Creation of false healthcare surrogate documentation to access funds

d) Concealment of financial transactions and records

5. VALUE OF CONVERTED PROPERTY

The total value of converted federal funds substantially exceeds the $1,000 felony threshold:

a) Approximately $136,575.93 in documented Federal OPM payments

b) Additional $5,186.35 in U.S. Treasury payments

c) Unauthorized disbursements exceeding $71,223.79

d) Suspicious facility payments totaling $251,820.52

WHEREFORE, Plaintiffs request:

1. Damages equal to the amount of federal funds converted

2. Civil monetary penalties as provided by law

3. Disgorgement of all proceeds from converted federal funds

4. Such other relief as the Court deems just and proper

## CLAIM FOR RELIEF
18.U.S.C. §1341, 1343

## **CLAIM FOR RELIEF**
Freedom of Religion


## **CLAIM FOR RELIEF**
18.U.S.C. §371

(Conspiracy to Defraud the United States)


Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

Plaintiffs allege that Defendants conspired to defraud the United States through the following conduct:

1. CONSPIRACY AGREEMENT AND PARTICIPANTS

   The following Defendants knowingly and willfully conspired to defraud the United States:

   a) Howard Kessler, M.D.

   b) Anne Van Meter

   c) Twyla Sketchley, Esq.

   d) Leonard Helfand

   These Defendants formed an association-in-fact enterprise to systematically exploit federal benefits and defraud federal healthcare programs.

2. OBJECT OF THE CONSPIRACY

Defendants conspired to:

a) Gain control over Federal OPM Retirement Funds totaling $136,575.93

b) Circumvent federal oversight of benefits administration

c) Convert federal funds through unauthorized disbursements

d) Conceal transactions from federal authorities and the Court

3. OVERT ACTS IN FURTHERANCE OF CONSPIRACY

Defendants took numerous overt acts including:

a) October 11, 2019: Filing false guardianship documents to gain control over federal funds

b) October 12, 2019: Executing unauthorized contracts and receiving $750 kickback payment

c) December 26, 2019: Improperly modifying trust documents to control federal benefit payments

d) March 31, 2021: Filing fraudulent successor guardian petition concealing prior misconduct

4. SPECIFIC FRAUDULENT CONDUCT

The conspiracy involved systematic fraud through:

a) Creation of false healthcare surrogate documentation

b) Unauthorized disbursements exceeding $71,223.79 without court approval

c) Suspicious payments totaling $251,820.52 to undisclosed facilities

d) Concealment of financial transactions from federal authorities

5. HARM TO THE UNITED STATES

This conspiracy resulted in:

a) Misappropriation of Federal OPM Retirement Funds

b) Fraudulent use of federal healthcare benefits

c) Circumvention of federal benefits administration procedures

d) Approximately $500,000 in damages to federally protected assets

WHEREFORE, Plaintiffs request:

1. Treble damages for all misappropriated federal funds

2. Civil penalties as provided by law

3. Disgorgement of all proceeds from the conspiracy

4. Such other relief as the Court deems just and proper

## CLAIM FOR RELIEF
### (Civil Conspiracy)

1. The Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

2. The Defendant **Collaborators** herein had a business interest in seeing that they were employed by, appointed as or hired to become involved in as many estates as possible, noticeably those Trusts and Estates with significant assets able to sustain prolonged and multiple fees billed by these entities.

3. The Defendant **Collaborators,** one with the other, conspired to solicit and prolong the administration of their business appointment, employment or activities providing extended and many times questionable healthcare and administrative services to these economically blessed and therefore vulnerable individuals.

4. In order to benefit and profit from such conspiratorial conduct, the Defendant **Collaborators** endeavored to see that the same providers, attorneys or guardian were

appointed or selected to act in each case. In this manner, they could control the assets of the relevant Trust or assets of the individual dealing the profits and ill-gotten gains out amongst themselves.

5. As a direct and proximate result of Defendant **Collaborators'** civil conspiracy, Plaintiffs were caused economic harm, suffered substandard and harmful healthcare as well as incurring significant attorneys' fees and costs.

## CLAIM FOR RELIEF
### (Fraud Against
### All Defendant Collaborators)

1. The Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

2. The Defendant **Collaborators** conspired among themselves and with others to commit and did commit fraud in the manner and method they created extremely complicated land and asset transfers in order to fraudulently conceal the

manipulation of the Trust assets from Plaintiffs and the Ward.

3. The Defendant **Collaborators** fraudulently misrepresented the actual health status of Ward to the Probate court in order to keep his status as having capacity to justify decision they were making while taking measures to keep him from attending court appearances or completing a capacity evaluation under their and their designee's control with the self-intent of prolonging their fees and increasing their ill-gotten gains. In doing so, they falsified records, suborned perjury and submitted the Ward to unnecessary and harmful healthcare procedures.

4. The Defendant **Collaborators** fraudulently misrepresented the facts and circumstances of Ward, his Trust and his physical and mental status to the Guardianship/ Probate Court for their own self-interest and personal gain.

5. As a direct and proximate result of Defendant **Collaborators'** fraudulent conduct, Plaintiffs incurred significant economic damages, including attorneys' fees and costs.

## CLAIM FOR RELIEF
## (Negligent Misrepresentation)

6. The Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

7. The Defendant **Collaborators** made false representations concerning the nature and extent of Ward personal health status and the representations were relied upon to his detriment.

8. The Defendant **Collaborators** made false representations about the status of Ward Trust and created false documents, change his estate planning while he did not have capacity, all of which were relied upon by others to their detriment.

9. The Defendant **Collaborators** had a pecuniary interest in making such representations and owed a duty of care to see that they communicated truthful information. The Defendant **Collaborators** breached their duty in all respects by failing to exercise due care. The Plaintiff(s) and Ward did not know at the time concerning the circumstances under

which the Defendant **Collaborators** maneuvered the Ward into and as such he was forced to rely on the misrepresentation and act in a manner to his detriment that she would not have done had such statements and representations not have been made.

10. As a direct and proximate result of Defendant **Collaborators'** wrongful acts, Plaintiff(s) and the Ward were caused to sustain substantial financial loss and to undergo substantial and harmful healthcare resulting in significant mental and emotional distress. The Plaintiff(s) and Ward suffered economic damages and incurred attorneys' fees and costs as well as suffered mental and emotional distress as a result of Defendant **Collaborators'** wrongful conduct.

## CLAIM FOR RELIEF
### (Tortious Interference with Inheritance)

1. The Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

2. Throughout the years, Ward and his family members (Plaintiffs), took special care to protect the assets he had acquired through

his operation of a successful business with a Living Trust, including after Victor Lambou, the Ward passed away.

3. The purpose of the Living Trust as it matured was to insure that Victor Lambou received the equity established through the sale of any of his property and that his needs be properly met and his rights to the income be protected as well as guarantee that he had custody and control of such assets as well as the legal ability to decide what was in his best interests as long as he possessed the requisite capacity to do so.

4. Despite such preparation and contrary to his express intention and those set forth in the Living Trust, the Defendant **Collaborators** set out upon a scheme to deceive and defraud the Victor Lambou by fraudulently gaining control of his assets, siphoning them off and directing them to their own personal gain. They conspired together to create their scheme and through acts of extortion, the exertion of interference and undue influence and outright collusion, they stole his assets, redistributed them to themselves, thereby frustrating the careful plan Victor Lambou and his family had created and

refined to insure that he enjoy the fruits of his labor, love and life together for so long as he would live.

5. The scheme employed by the Defendant **Collaborators** as more specifically set forth herein tortiously interfered with Plaintiff(s) right to inherit the full measure of the Living Trust by frustrating its intended purpose and converting its assets to the personal gain of the Defendant **Collaborators** herein.

6. As a direct and proximate result of the Defendant **Collaborators** wrongful acts, tortious interference with their right to bequeath and inherit, the Plaintiffs, the Estate of Victor Lambou suffered substantial economic damages including, but not limited to, loss of their economic benefits specified in the Trust documents, attorneys' fees and such other and further relief as the Court deems just and equitable.

## <u>CLAIM FOR RELIEF</u>
### (Malicious Prosecution)

1. Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs.

**2.** In what must be the cruelest example of willful and wanton conduct intended to injure the rights of another, Defendant **Collaborators,** against all facts, logic and good conscience, to sue Plaintiff(s) by filing an objectively baseless guardian and conservatorship action, in Leon County Probate Court on behalf of Defendant **Collaborator,** in a desperate attempt to retain unlawful custody and control of the assets of Victor Lambou**.**

3. The Defendant **Collaborators** knew that such conduct and action was expressly contrary to the estate documents and was designed and intended rather than the just adjudication of legal rights, but as an artifice to invalidate Plaintiff(s) rights through a court recognized and approved voluntary guardianship, to keep control of the sizable assets, while claiming Victor Lambou was consenting to their control over his assets. It was expressly designed to illegally retain for their own personal gain the significant assets over which Plaintiffs had control. The action was designed to coerce and intimidate the Plaintiffs and to create significant delay in order to ultimately deny justice to Plaintiffs.

4. The Defendant **Collaborators** acted by expressly conducting the litigation with dilatory actions designed to prolong the status quo as long as possible, while never truly intended to adjudicate the matters stated in the Petition. The Defendant **Collaborators** filed no Petitions for fees, evaded capacity evaluations of Victor Lambou by falsely conveying to the Court they were appealing, flooded the Court with accusatory pleadings containing false statements about the Plaintiff(s) until the Ward died and continued to fail to turn over completed accounting to not allow for Victor Lambou Guardianship Estate to close and transfer to probate where the Plaintiff(s) were personal representative, while filing meritless claims against the Plaintiffs. Furthermore, they refused to engage in basic discovery, forcing the Plaintiffs to have to file Motion to Compel their deposition, when they were planning to testify as adversarial witnesses.

5. As a direct and proximate result of the Defendant **Collaborators'** willful, wanton and intentional conduct, Plaintiffs were embroiled in senseless, objectively baseless

litigation, for several years, which deprived the Ward of his rights and benefits he had duly acquired and deserved.

6. As a direct and proximate result of the Defendant **Collaborators'** malicious prosecution of the Plaintiff, they sustained substantial financial loss, attorneys' fees and costs and is entitled to punitive damages and such other and further relief as the court may deem just and equitable.

## <u>CLAIM FOR RELIEF</u>
### (BREACH OF FIDUCIARY DUTY)

Plaintiffs incorporate and reallege all of the allegations contained in the preceding paragraphs

Plaintiff(s) vs. Defendant Van Meter & Defendant Helfand, as Guardians of Property

1. DEFENDANT HELFAND AND DEFENDANT VAN METER, had a fiduciary duty to the Estate of Victor Lambou, as Guardian(s) of property.

2. DEFENDANT HELFAND AND DEFENDANT VAN METER violates *§744.441, §744.359, §744.361 from* the time they

were appointed Guardian and Successor Guardian.

3. Fla. Supreme Court Case <u>Bryan</u>, states :

4. "...while a power of attorney may indeed be useful in certain

5. circumstances, we find that the central value of a voluntary guardianship lies in the **availability of desired court supervision without a finding of mental incompetency**." <u>Bryan v. Century Nat. Bank</u>, 498 So. 2d 868, 872 (Fla. 1986)

6. The guardian remains accountable to "render a full and correct account of the receipts and disbursements of ... his ward's property" annually under section 744.427 only for that property placed in his control, and he is otherwise bound as to that property under ordinary principles of guardianship. In dealing with that property, then, he must obtain court approval if required by section 744.441, and may act in its absence if so permitted under section 744.444.<u>Bryan v. Century Nat. Bank</u>, 498 So. 2d 868, 872 (Fla. 1986)

7. Further, the guardian must ensure that the ward understands that if the ward wishes to deal with any of that property, the ward must so inform the guardian and either a) seek court approval of the transaction, or b) petition for transferal of the property to the ward's control. We do not share the district

court's fears of "willy-nilly" transfer of the ward's property,
*873 finding persuasive the California Supreme Court's
holding in *Board of Regents State Universities, State of
Wisconsin v. Davis,* 14 Cal.3d 33, 120 Cal.Rptr. 407, 533 P.2d
1047, 1054 (1975):Bryan v. Century Nat. Bank, 498 So. 2d
868, 872–73 (Fla. 1986)

8. The statute before the court, section 744.341, Florida Statutes
(1979), included a provision in subsection (2) that "[a]ny
guardian appointed under this section shall have the same
duties and responsibilities as are provided by law as to
guardians of property generally." While this provision provided
a voluntary guardian with a general understanding of his
duties, it failed to acknowledge even the most basic distinction
between voluntary and involuntary guardianships. Bryan v.
Century Nat. Bank, 498 So. 2d 868, 870 (Fla. 1986) The most
basic distinction, of course, involves the competency of the
ward. While an involuntary guardianship requires an
adjudication of incompetency, section 744.331, Florida
Statutes (1985), the voluntary scheme requires an affirmative

finding of competency. § 744.341(1).*Id.*

9. As cited in Fla. Supreme Court Case <u>Bryan</u>, Transactions involving property surrendered by a competent ward to control of a voluntary guardian are void unless court approval is first obtained; disapproving *Fleming v. Fleming*, 352 So.2d 895 (Fla.App. 1 Dist.). West's F.S.A. § 744.341(1). <u>Id.</u>

10. DEFENDANT HELFAND AND DEFENDANT VAN METER had a duty to seek Court approval in any transaction involving any of the Testator's property, including his Living Revocable Trust.

11. DEFENDANT HELFAND AND DEFENDANT VAN METER violate 744.359 (2) Commits Exploitation DEFENDANT VAN METER violates 744.359 (1)(2)(A) Commits Fraud by Obtaining Appointment when she failed to disclose the conflicts of interest.

12. DEFENDANT HELFAND AND DEFENDANT VAN METER violate 744.359 (1)(2)(B) Abuses his or her powers when they failed to seek court approval for issues mandated under 744.441 and when Defendant Van Meter exceeded the scope of her power granted as successor guardian of property DEFENDANT HELFAND AND DEFENDANT VAN METER

violate 744.359 (1)(2)(C) Wastes, embezzles, or intentionally mismanages the assets of the ward when they took measures to make payments without court approved and left the guardianship account depleted with no ability to pay wrap up costs.

13. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated744.361(2) The guardian failed to act within the scope of the authority granted by the court and as provided by law.

14. DEFENDANTHELFAND AND    DEFENDANT VAN METE violate Violated 744.361 The guardian failed to act in good faith.

15. DEFENDANT HELFAND AND    DEFENDANT VAN METER violate Violated 744.361 A guardian failed to act in a manner that is contrary to the ward's best interests under the circumstances.

16. DEFENDANTHELFAND AND    DEFENDANT VAN METE violate Violated 744.361 A guardian who has special skills or expertise, or is appointed in reliance upon the guardian's representation that the guardian has special skills

or expertise, shall use those special skills or expertise when acting on behalf of the ward.

17. DEFENDANTHELFAND AND DEFENDANT VAN METER violate Violated 744.361 The guardian failed to file an initial guardianship report in accordance with s. 744.362.

18. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361The guardian failed to file a guardianship report annually in accordance with s. 744.367 DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361(10) (a) Failed to Protect and preserve the property and invest it prudently as provided in chapter 518, apply it as provided in s. 744.397, and keep clear, distinct, and accurate records of the administration of the ward's property.

19. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361(10) (b) Perform all other duties required of him or her by law.

20. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361(c) At the termination of the guardianship, failed to deliver the property of the ward to the

Co-Personal Representatives.

21. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361The guardian failed to observe the standards in dealing with the guardianship property that would be observed by a prudent person dealing with the property of another.

22. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361(13)(b) Failed to allow the ward to maintain contact with family and friends DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361(13)(c) Failed to consider the least restrictive measures of the Ward and not restrict the physical liberty of the ward more than reasonably necessary to protect the ward or another person from serious physical injury, illness, or disease.

23. DEFENDANT HELFAND AND DEFENDANT VAN METER violate Violated 744.361(13)(h) Evaluate the ward's medical and health care options, financial resources, and desires when making residential decisions that are best suited for the current needs of the ward.

24. DEFENDANT HELFAND AND DEFENDANT VAN METER

violate Violated 744.359 by exploiting the Testator; Committing fraud in obtaining appointment as a guardian; Abusing his or her powers; Wasting, embezzling, and intentionally mismanages the assets of the ward/ Testator

WHEREFORE, PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir, requests the Court award damages against DEFENDANT(S) VAN METER AND HELFAND and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against DEFENDANTS.


## CLAIM FOR RELIEF

### (NEGLIGENCE)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

Negligence Against Defendant(s) Van Meter and Helfand, as Guardians

1. PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir, hereby re-alleges and adopts by reference all allegations contained as if fully set forth herein.

2. A standard in dealing with guardianship property that would be observed by a prudent person dealing with the property of another, in the best interest of the ward, using such special skills and/or expertise to the extent that any such representation was made as to the special skills or expertise of the guardian.

3. DEFENDANT(S) VAN METER AND HELFAND, as Guardians as guardians of the Ward/ Testator, negligently administered the guardianship by failing to discharge their duties as guardian and by wasting and mismanaging the Ward's property.

4. DEFENDANT(S) VAN METER AND HELFAND, as Guardians as guardians of the Ward/ Testator, were negligent in the following ways:

   A. By failing to properly manage the Testator's Guardianship and Trust Estate By failing to

perform proper due diligence of the Testator's
Guardianship and Trust Estate;

B. By failing to take action against creditors

C. By failing to ensure that that the property
was properly managed and not depleted

D. By failing to seek proper Court approval over
decisions that substantially effected the
Testator's Guardianship and Trust Estate;

5. By permitting the guardianship attorney's to collect
unnecessary and excessive fees; By failing to monitor or
challenge excessive hourly attorney's fees charged by the
guardianship attorneys; DEFENDANT(S) VAN METER AND
HELFAND, as Guardians as guardians of the Ward/ Testator
had a duty to the Ward to administer the guardianship. By
failing to prepare accurate annual reports regarding the
guardianship assets;

6. By failing to maintain guardianship financial records to
accurately track and recover guardianship assets; By
pursuing needless and wasteful litigation against the Ward's

heirs and Beneficiaries; By charging the Ward excessive guardian fees;

7. As a direct and proximate result of the negligence of Defendant(s) Van Meter and Helfand, as Guardians as guardians of the Ward/ Testator, as set forth above, the Ward/Testator has suffered damages.

WHEREFORE, PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir, requests the Court award damages against DEFENDANT(S) VAN METER AND HELFAND and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against DEFENDANTS.

## **CLAIM FOR RELIEF**

### **(PROFESSIONAL NEGLIGENCE)**

Professional Negligence against Defendant(s) Heuler and Heuler,

Wakeman, and Solomon Law Group, PLLC. And Defendant Johnson

and William Johnson, P.A.


PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal

Representative of the Estate of Victor William Lambou, deceased,

and PLAINTIFF, VICKI LAMBOU, as natural heir, hereby re-

alleges and adopts by reference all allegations contained in, as if

fully set forth herein.

1. DEFENDANT HEULER AND HEULER, WAKEMAN, AND

   SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT

   HELFAND AND DEFENDANT VAN METER") and DEFENDANT

   JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel for

   DEFENDANT VAN METER") represented DEFENDANT

   HELFAND  AND  DEFENDANT VAN METER, in  their

   capacity as guardian for the Testator., in connection with his

   property and thereafter.


2. DEFENDANT HEULER AND HEULER, WAKEMAN, AND

SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel f o r DEFENDANT VAN METER") undertook to provide legal services to the guardianship, with the full knowledge that the Testator was an intended beneficiary of their legal services. At all times DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM    JOHNSON,    P.A. ("Counsel f o r DEFENDANT VAN METER") held themselves out as competent in the areas of law for which they was retained to provide representation.DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel for DEFENDANT VAN METER") were required to exercise the same legal skill as a reasonably competent attorney and to use reasonable care in determining and implementing a strategy to be followed to achieve the guardianship's goals, or

alternatively goals that were in the best interest of the Testator.

3. In the course of handling legal matters for the guardianship, DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A.  ("Counsel f o r

4. DEFENDANT VAN METER") negligently failed to act with the degree of competence generally possessed by attorneys in the State of Florida who handle similar matters. The Testator through his guardians was forced to pay DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel for DEFENDANT VAN METER") a substantial amount of money for his representation.

5. DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel f o r

DEFENDANT VAN METER") were negligent and/or committed

malpractice in the following ways:

a. By failing to perform proper due diligence of the Guardianship

Estate and Trust Estate.

b. By failing to advise the guardianship regarding the clear

discrepancy in the values of the properties .

c. By advising the client to make decisions over the Guardianship

Property without Court Approval.

d. By failing to advise the guardianship to take action against
creditors.

e. By mismanaging property and allowing property to be taken without

Court approval.

f. By charging and taking from the guardianship excessive attorney's

fees; and by failing to prevent excessive fees to be taken from the

Guardianship and Trust Estate;

g. By failing to properly prosecute claim against DEFENDANT(S) TWYLA

SKETCHLEY, ESQ. AND THE SKETCHLEY LAW FIRM, HOWARD

KESSLER, M.D., ANNE VAN METER, VICTORIA HEULER AND

HEULER,

h. WAKEMAN, AND SOLOMON LAW GROUP, PLLC, legal fees for unnecessary eviction.

i. Engaging in acts constituting a conflict of interest by seeking to avoid recoupment against creditors, keeping it undisclosed that DEFENDANT HOWARD KESSLER, M.D., was not the Healthcare Surrogate and that DEFENDANT ANNE VAN METER should not have been appointed as Guardian, due to the conflicts of interest, that contracts should have been invalid when the Testator/Ward entered into contracts during the guardianship without Court Approval and;

1. As a direct and proximate result of DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT HELFAND AND DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel for DEFENDANT VAN METER") negligence and/or malpractice, the Testator/ Ward sustained damages.

2. DEFENDANT TWYLA SKETCHLEY, ESQ. AND THE SKETCHLEY LAW FIRM is vicariously liable for the negligence of its attorneys including DEFENDANT HEULER AND HEULER, WAKEMAN, AND SOLOMON LAW GROUP, PLLC ("Counsel for DEFENDANT

HELFAND and DEFENDANT VAN METER") and DEFENDANT JOHNSON AND WILLIAM JOHNSON, P.A. ("Counsel for Defendant Van Meter")

WHEREFORE, PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir, requests the Court award damages against Defendant(s) Van Meter and Helfand and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against Defendants.

## CLAIM FOR RELIEF
### (CIVIL THEFT)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

1. PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir, hereby re-alleges and adopts by reference all allegations contained in, as if fully set forth herein.

2. To state a claim for civil theft under Florida law, plaintiff must allege that defendant (1) knowingly (2) obtained or used, or endeavored to obtain or use, plaintiff's property with (3) "felonious intent" (4) either temporarily or permanently to (a) deprive plaintiff of its right to or a benefit from the property, or (b) appropriate the property to defendant's own use or to the use of any person not entitled to the property. <u>United Technologies Corp. v. Mazer, C.A.11 (Fla.)2009, 556 F.3d 1260</u>

3. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, had knowledge of the Testator's diagnosis of Dementia in 2019.

4. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, had knowledge of the Testator's property. Defendant Sketchley created the Testator's Estate Planning in April 4, 2018 and conversed with Defendant(s) Van Meter and Kessler about the Testator's property.

5. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, have a history of handling guardianship and probate cases together. DEFENDANT SKETCHLEY advised the Testator to enter into a Voluntary Guardianship of Property and took

measures to keep the Court from knowing the Testator lacked capacity at all times to enter or consent to any of the measures taken on his property during the guardianship.

1. DEFENDANT(S) VAN METER AND KESSLER intentionally entered into contracts with the Testator during his guardianship seeking reimbursements of funds with knowledge the Testator did not have the capacity to enter into these contracts.

2. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, took measures without Court approval to pay themselves from the Testator's estate, while continuing to hide from the Court that the Testator lacked capacity.

3. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, were not entitled to these funds at the time the Defendant(s) possessed these funds.

WHEREFORE, PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir,

requests the Court award damages against DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against DEFENDANTS.

## **CLAIM FOR RELIEF**
### **(DEFAMATION/DEFAMATION PER SE)**

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

1. Plaintiff(s), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, hereby re-alleges and adopts by reference all allegations contained in paragraphs supra, as if fully set forth herein.

2. Elements of defamation claim include (1) false and defamatory statement concerning another, (2) unprivileged publication to a third party, (3) fault amounting at least to negligence on part of publisher, and (4) either actionability of statement irrespective

of special harm or existence of special harm caused by publication. Restatement (Second) of Torts § 558. <u>Thomas v. Jacksonville Television, Inc.</u>, 699 So. 2d 800 (Fla. Dist. Ct. App. 1997)

3. As testified to during a hearing held on 4/3/24, DEFENDANT SKETCHLEY, confirmed PLAINTIFF GERALYN, was *currently living* with Mr. Lambou at the time the Petition was filed. However, DEFENDANT SKETCHLEY, referred to PLAINTIFF GERALYN, as his "estranged daughter" in her responsive motion filed on 2-27-2020, directly after PLAINTIFF GERALYN, filed various Motions to contest the ward's capacity and notify the Court that DEFENDANT SKETCHLEY, was exploiting of her father.

4. DEFENDANT SKETCHLEY, proceeds to open criminal investigations against PLAINTIFF GERALYN, and alleges in her responsive motion filed on 2-27-2020 that PLAINTIFF GERALYN, "had been found by Florida's Adult Protective Services to have abused, neglected and/or exploited Mr. Lambou". In this responsive motion DEFENDANT SKETCHLEY, refers to her client as a "vulnerable adult". However, just two

days later on 2-29-2020, DEFENDANT SKETCHLEY, claims PLAINTIFF GERALYN, was only "subject to an open criminal investigation of Mr. Lambou" and later testified on April 3, 2024, "there was never a finding for exploitation against PLAINTIFF GERALYN".

5. DEFENDANT SKETCHLEY, made statements and publishings to 3rd parties calling PLAINTIFF GERALYN, "the exploiter", criminal, accusing her of abusing and exploiting her father.

6. PLAINTIFF GERALYN, has suffered damage in result of these statements

WHEREFORE, Plaintiff, GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, requests the Court award damages against Defendant(s) Sketchley, and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against Defendants

## **CLAIM FOR RELIEF**
### **(UNFAIR AND DECEPTIVE TRADE PRACTICES)**

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir hereby re-alleges and adopts by reference all allegations contained in supra, as if fully set forth herein.

In order to assert a claim for damages under Florida Deceptive and Unfair Trade Practices Act (FDUTPA), the plaintiff must establish: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. West's F.S.A. § 501.201 et seq. <u>Baptist Hosp., Inc. v. Baker</u>, 84 So. 3d 1200 (Fla. Dist. Ct. App. 2012) DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, had knowledge of the Testator's diagnosis of Dementia in 2019.

1. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, had knowledge of the Testator's property. Defendant Sketchley created the Testator's Estate Planning in April 4, 2018 and conversed with Defendant(s) Van Meter and Kessler about the Testator's property.

2. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, have a

history of handling guardianship and probate cases together. Sketchley advised the Testator to enter into a Voluntary Guardianship of Property and took measures to keep the Court from knowing the Testator lacked capacity at all times to enter or consent to any of the measures taken on his property during the guardianship.

3. DEFENDANT(S) VAN METER AND KESSLER intentionally entered into contracts with the Testator during his guardianship seeking reimbursements of funds with knowledge the Testator did not have the capacity to enter into these contracts.

4. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, took measures without Court approval to pay themselves from the Testator's estate, while continuing to hide from the Court that the Testator lacked capacity.

5. DEFENDANT(S) SKETCHLEY, VAN METER, & KESSLER, were not entitled to these funds at the time the Defendant(s) possessed these funds.

6. Testator suffered damage directly related to relying on the advice of these professionals.

7. WHEREFORE, Plaintiff(s), DENITA LAMBOU and GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir requests the Court award damages against Defendant(s) Sketchley, Van Meter, & Kessler and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against Defendants

## CLAIM FOR RELIEF

## (FALSE IMPRISONMENT)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

1. PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir hereby re-alleges and adopts by reference all allegations contained in paragraphs 1 through 96, supra, as if fully set forth herein.

2. The elements of a cause of action for false imprisonment include: 1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or color of authority and 4) which is unreasonable and unwarranted under the circumstances. <u>Montejo v. Martin Mem'l Med. Ctr., Inc.</u>, 935 So. 2d 1266 (Fla. Dist. Ct. App. 2006)

3. DEFENDANT(S) VAN METER, & KESSLER, had knowledge of the Testator's diagnosis of Dementia in 2019.

4. DEFENDANT(S) VAN METER, & KESSLER, falsely supplied living facilities unexecuted documents and held themselves to be family members of the Testator where they moved him 4 times, signing contracts that held the Testator responsible for substantial rents without authority to do so.

5. DEFENDANT(S) VAN METER, & KESSLER, refused to list the Plaintiff(s), who were the natural heirs of the Testator on any paperwork and deprived the Testator of contact with his family. Furthermore, Defendant(s) Van Meter, & Kessler, took action to prevent the Testator's family from knowing his location and if they did find out his location took action to prevent family from

being able to access the Testator.

6. DEFENDANT(S) VAN METER, & KESSLER, failed to notify the court to these actions and took action to sell the Testator's homestead property without his consent, leaving him no home to go back to, while they received kick-backs and referral fees from these living facilities.

7. Testator suffered damage directly related to relying on the advice of these professionals.


WHEREFORE, Plaintiff(s), DENITA LAMBOU, & GERALYN LAMBOU as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir requests the Court award damages against Defendant(s) Van Meter, & Kessler and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against Defendants


## CLAIM FOR RELIEF

### (INENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

Plaintiffs incorporate and reallege all of the allegations contained in the proceeding paragraphs.

PLAINTIFF(S), DENITA LAMBOU & GERALYN LAMBOU, as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir hereby re-alleges and adopts by reference all allegations contained in as if fully set forth herein.

1. the defendant(s) must act intentionally or recklessly;

2. the defendant(s) conduct must be extreme and outrageous; and

3. the conduct must be the cause (4) of severe emotional distress.

WHEREFORE, Plaintiff(s), DENITA LAMBOU, & GERALYN LAMBOU as Personal Representative of the Estate of Victor William Lambou, deceased, and PLAINTIFF, VICKI LAMBOU, as natural heir requests the Court award damages against Defendant(s) and such other relief as the Court deems just and proper, including an award of attorneys' fees and costs against Defendants

## VI.    DEMAND FOR JURY TRIAL
Plaintiffs hereby demand a jury trial on all causes of action.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE and by reason of the above and foregoing, Plaintiffs pray for judgment, jointly and severally, against the Defendant **Collaborators** as follows:

1. Awarding Plaintiffs actual damages, treble damages and punitive damages and prejudgment interest as a result of the wrongful conduct complained of herein;

2. Awarding injunctive relief prohibiting Defendant **Collaborators** from continuing to engage in the illegal practices described herein in this and other similar circumstances;

3. Awarding Plaintiffs their attorneys' fees for having to file this lawsuit to enforce their undeniable rights, as well as costs incurred therein, including expert fees and expenses;

4. Requiring Defendant **Collaborators** to provide an accounting to Plaintiffs and to disgorge all ill-gotten gains for which they were unjustly enriched; and

5. Awarding Plaintiffs such other and further relief as the Court may deem just and equitable.

## CERTIFICATE OF SERVICE

WE DO CERTIFY, that a copy of the foregoing has been furnished the PACER and will be served process to all DEFENDANT(S) listed.

12-6-2024                                    /s/ Michael Ferderigos
Dated                                        Michael Ferderigos, Esq.
                                             Bar No.: 604011
                                             10454 Birch Tree Lane
                                                 Windermere, FL 34786
                                             Telephone 407-592-0035
                                             michael@civilestatelaw.com